JUSTICE RICE,
dissenting.
¶31 I believe the Court has incorrectly stated and applied the standards of review and conducted an analysis which is contrary to the correct standards.
¶32 The Court holds, without citation to authority, that it is “immaterial” whether the District Court failed to defer to DEQ’s interpretation of its administrative rule, and failed to defer to DEQ’s expertise in the subject matter, because this Court exercises de novo review in summary judgment matters. Opinion, ¶ 21. In effect, the Court holds that the standards applied by the District Court simply don’t matter, because in the end this Court can cure any errors by giving necessary deference to the agency when conducting de novo review. I submit that this rendering of our review standards is flawed and will cause problems in future cases.
¶33 While it is technically true that the District Court decided this *437 case by summary judgment, that was done largely as a matter of nomenclature. This is not the typical litigation case where the evidentiary record is developed in discovery. The trial court was not called on to determine whether the evidence demonstrated material factual conflicts. Rather, the evidentiary record-here, a massive one-was compiled before DEQ, which applied its expertise to that record. Consequently, we have held that in such cases that a court’s standards of review are narrow-narrower, in my view, than the Court’s opinion evidences.
¶34 We have explained that, in these cases, “our standard of review is limited to whether the agency erred in law or whether its decision is wholly unsupported by the evidence or clearly arbitrary or capricious.” Winchell v. Mont. Dep’t of Nat. Resources & Conserv., 1999 MT 11, ¶ 11, 293 Mont. 89, 972 P.2d 1132. “[W]e only inquire insofar as to ascertain if the agency has stayed within its statutory bounds and has not acted arbitrarily, capriciously, or unlawfully.” Winchell, ¶ 11. Further, “[w]e afford great deference to agency decisions, especially where it implicates substantial agency expertise.” Winchell, ¶ 11 (emphasis added). “In reviewing an agency decision to determine if it survives the arbitrary and capricious standard, we consider whether the decision was ‘based on a consideration of the relevant factors and whether there has been a clear error of judgment.’” Clark Fork Coalition, ¶ 21 (citations omitted).
¶35 A district court’s failure to properly apply these standards is legal error which this Court must determine how to remedy. Such error must either be reversed, as in Clark Fork Coalition, ¶ 50, or must be remedied by a determination that the case can be affirmed in spite of the error, as in Winchell, ¶ 12. We do not have the option of dismissing a district court’s erroneous application of the standards of review as “immaterial.” Opinion, f 21. A district court’s error in the application of the standards commonly leads to an incorrect result, which improperly shifts the burden of demonstrating error on appeal to the wrong party. That is particularly prejudicial in a case that involves a massive evidentiary record and complicated issues, as here. This Court must enforce the proper application of all the standards of review by the district courts.
¶36 Turning to the basis of the Court’s decision, the Court concludes that DEQ’s approval of the General Permit “was arbitrary and capricious because DEQ failed to consider the relevant factors” and “committed a clear error of judgment.” Opinion, ¶ 29. This conclusion is premised on the Court’s factual summary of the case. However, the Court’s summary of the case is the Court’s own story-a story based on *438 a very selective review of the evidentiary record and one that is contrary to the record as a whole. The Court’s selective review leads to the conclusion that DEQ “failed to consider the relevant factors,” Opinion, ¶ 29, but this conclusion is unsupportable from a proper review of the full record. Indeed, DEQ carefully considered and addressed all of the required factors.
¶37 The Court reasons that DEQ erred by failing to designate the Rock Creek discharge area as one of “unique ecological significance,” which in turn is based on two primary factual conclusions: 1) the discharge of sediment from road improvements, which the Court characterizes as the “problem for Revett”; and 2) what the Court describes as the “precarious state” of the bull trout population. See Opinion, ¶ 12.1 will address each of these factual issues and then turn to the legal issue of the determination of “unique ecological significance.”
¶38 Regarding discharge of sediment from road construction, the Court first fails to understand the current state of road sediment discharge. The area of the proposed mine has been logged since the late 1800’s and has a patchwork of old clear cuts connected by dirt roads, including the old Forest Service road which will serve as Revett’s access road. These historic logging roads have not been properly maintained and are currently causing excessive discharge of sediment into Rock Creek, at no fault of Revett. It is estimated that 379 tons of sediment are currently being discharged annually into Rock Creek, with corresponding current impact on trout populations. It is estimated that, if unmitigated, Revett’s activities could increase the discharge of sediment into Rock Creek by 1,415 tons per year. Thus, mitigation has always been a necessity. The post-EIS Record of Decision by DEQ and the U.S. Forest Service imposed a mitigation requirement under which Revett would decrease sediment discharge by 1,430.4 tons annually-not only mitigating all of its own discharge, but also reducing the current discharge by 15.4 tons annually. Then, Revett’s actual plan, submitted in response to the imposition of the mitigation requirement, proposed to further mitigate by decreasing annual sediment discharge by an additional 39.5 tons, and thus Revett’s project is anticipated to reduce current discharge by a total of 54.9 tons annually.
¶39 A question raised about the process of implementing this plan was whether Revett’s road construction activity would temporarily increase sediment discharge before full mitigation was in effect. To address this concern, and to ensure that reality comports with the above estimates of sediment discharge, Revett has been required, before beginning and *439 throughout the project, to conduct extensive monitoring of Rock Creek substrate composition, fine sediment levels, and fish population, and to report these results to the agencies. The agencies concluded that this monitoring and mitigation plan “would offset project effects concurrent with construction” and that “there would be no net short-term increase” in sediment discharge during the project. The USFWS added that “[t]he effect of sediment intrusion into the stream channel should be minimized” by these abatement measures.[1]
¶40 On the second factual issue, the bull trout analysis is significantly informed by the USFWS’s jeopardy determination. That agency analyzes these questions by geographic area. The Clark Fork River Management Unit is one of 23 geographic units within the Columbia River Recovery region. The Lower Clark Fork Core Area is one of 35 areas within the Clark Fork Unit. The Rock Creek Local Population is one of 14 populations within the Lower Clark Fork Core Area.
¶41 In making its jeopardy determination concerning the small population, in both numbers and size, of the Rock Creek bull trout, the USFWS evaluated the stability of the 14 local populations of bull trout in the Lower Clark Fork Core Area. The USFWS determined that 80 to 90 percent of adfluvial, migratory bull trout in the Core Area are provided by populations which would not be impacted by the project. The USFWS commented that “Rock Creek bull trout are mainly resident fish and contribute relatively little to the Lower Clark Fork Core Area population because they are functionally isolated from the Lake Pend Oreille system (i.e., non-migratory) and have low reproductive potential” and, in any event, Rock Creek is “chronically dewatered” much of the year, foreclosing passage for all bull trout.[2] The USFWS’s 2006 report concluded that the mining project was not likely to jeopardize the continued existence of bull trout in the Lower Clark Fork Core Area but that adverse impacts to individual bull trout were likely. Thus, as with the sediment issue, mitigation was required. The mitigation measures imposed by the USFWS were in addition to the sediment mitigation measures required by DEQ and the Forest *440 Service, specifying various “reasonable and prudent measures” to minimize harm to individual bull trout.
¶42 In consideration of these mitigation efforts, the EIS concluded that the plan for the project (known as “Alternative V”) “now includes protection and mitigation measures needed to support the bull trout recovery effort and protect all forms of the species.” The agencies observed that the risk of adverse effects to bull trout under Alternative V was “minor” and only marginally greater than not constructing the mine at all, and that was only because, in operating a mine, the risk of human error could not be eliminated. Regarding the entire Phase II construction and operation of the mine, the USFWS concluded that any impact on bull trout would be diminutive and not likely to have an appreciable effect. The EIS concluded that “Alternative V now protects the Rock Creek bull trout subpopulation” during initial construction, and that mitigation actually provided a “high likelihood” of an “improving trend in aquatic resources over the life of the project.” As noted by the Court, in 2007 the USFWS issued a supplement that found that the mine would not jeopardize bull trout. Opinion, ¶ 8.
¶43 This discussion of the evidence is not meant to refute the Court’s version of the record-that’s not the point. The point is that the limited standard of review in this case requires that courts determine whether the agency’s decision is “wholly unsupported by the evidence,” or was arbitrary and capricious. Clearly, there was considerable evidence to support DEQ’s grant of the permit-evidence which the Court chooses not to consider and it cannot credibly be said that DEQ’s decision was “wholly unsupported by the evidence.” I now turn to the legal issue of DEQ’s determination that the Rock Creek area was not one of “unique ecological significance” under the governing regulation.
¶44 The Court appears to reach a lay fisherman’s conclusion about Rock Creek’s “uniqueness” instead of applying the governing legal principles. The regulation provides that DEQ may deny a permit if:
(e) the point source will be located in an area of unique ecological or recreational significance. Such determination must be based upon considerations of Montana stream classifications adopted under 75-5-301, MCA, impacts on fishery resources, local conditions at proposed discharge sites, and designations of wilderness areas under 16 USC 1132 or of wild and scenic rivers under 16 USC 1274.
Admin. R. M. 17.30.1341(4)(e). (Emphasis added.)
¶45 First, pursuant to the cross-referenced § 75-5-301, MCA, entitled “Classifications and standards for state waters,” Rock Creek is classified as a B-l river, the same class as a majority of Montana’s *441 streams and rivers. Given the numerous streams in Montana so classified, this does not give any uniqueness to Rock Creek. Rather, Montana rivers which are recognized for their unique ecological significance are classified as “Outstanding Resource Waters.” See §§ 75-5-315; -316, MCA.
¶46 Pursuant to the cross-referenced federal statutes, the Rock Creek area is not in a designated wilderness area and Rock Creek is not designated as a wild and scenic area. Consequently, the Court must look to the more general “impacts on fishery resources” and “local conditions at proposed discharge sites” in order to conclude the site is ecologically significant.
¶47 However, in addition to the evidence already discussed, there is abundant further evidence in the record that the bull trout population and habitat of this area is not in any way “unique.” According to the USFWS, the Rock Creek bull trout population is but one of 150 local bull trout populations in the Clark Fork River Management Unit and one of 14 local populations in the Lower Clark Fork Core Area. The USFWS explained that the populations in Rock Creek (7.1 miles) are a small part of the population in the Bull River (35.3 miles) and a very small part of the 3,372 miles of bull trout habitat in the Clark Fork River Management Unit. In fact, the USFWS essentially concluded that wiping out the entire Rock Creek population would not impact the health of the bull trout in the Lower Clark Fork Core Area-but proposed mitigation efforts would avoid that and would even go so far as to mitigate impacts to individual bull trout. Further, as discussed above, the mitigation efforts, including monitoring of sediment levels and fish populations, and the reduction of current sediment discharge, would not only ensure protection of existing resources, but would serve to enhance them. There is nothing unique about the bull trout habitat in this particular area, but even if there was, the mitigation efforts will actually serve to improve trout habitat, even during the construction phase.
¶48 The duty of the courts in applying the arbitrary and capricious standard is to determine whether the agency’s decision was “based on a consideration of the relevant factors and whether there has been a clear error of judgment.” Clark Fork Coalition, ¶ 21 (citation omitted). Further, we defer to an agency’s interpretation of its regulation, Clark Fork Coalition, ¶ 20, and in cases such as this one, “[w]e afford great deference to agency decisions, especially where it implicates substantial agency expertise,” Winchell, ¶ 11 (emphasis added). Clearly, DEQ engaged in a careful review of all the necessary factors and made a judgment well supported by the record in a complicated *442 matter which heavily implicated its expertise. Its judgment was reasonable and was not a “clear error.” It is not the duty of this Court to second guess the agency about the record or to substitute its judgment for the agency. However, by relying primarily on the 2000-2001 Biological Opinion and the 2007 supplemental Biological Opinion issued by the USFWS to the exclusion of the vast majority of the abundant evidence available to DEQ, it appears the Court has done exactly that.
¶49 The District Court concluded that “the spirit” of the regulation required a finding that Rock Creek was of unique ecological significance. The District Court failed to consider vast portions of the record. Citing to a few pieces of the record, the District Court substituted its judgment for the agency. This Court has done the same and has failed to properly apply the governing standards. I would reverse.
JUSTICE COTTER joins in the dissenting opinion of JUSTICE RICE.
JUSTICE BAKER did not participate in this matter.

 It should be noted that the agencies used conservative or “inflated” estimates of total sediment discharge from mining activity to insure that the mitigation requirement would establish “a high probability” that there would be “no net increase in fine sediment in Rock Creek, and a reasonable certainty of an actual reduction in fine sediment transport over the life of the mine.”

 The USFWS noted that as many as 10 adfluvial bull trout were found in Rock Creek during ideal stream conditions in 2004, but that the usual number is 0 to 4 in dewatered times. For purposes of this dissent, I will not further develop from the record the distinction between migratory and local (or “fluvial”) populations.